UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NADIA K. NAFFE,

      Plaintiff,

vs.

Case No. 8:04-CV-1916-T-27TGW

REPUBLICAN PARTY OF FLORIDA,
REPUBLICAN NATIONAL COMMITTEE
and BUSH-CHENEY '04, INC.,

      Defendants.

_____/

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES AND DEMAND FOR JURY TRIAL

### Nature Of The Case

1.      This is a suit for injunctive relief and damages to redress three illegal employment practices: (a) intentional race discrimination; (b) the maintenance of a racially hostile work environment; and (c) retaliation. The suit is brought pursuant to the provisions of 42 U.S.C. §1981; and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq.

2.      Nadia K. Naffe ("Naffe"), who is African-American, was hired by the Republican Party of Florida ("RPOF") in August 2003 as a Field Director for Southwest Florida. During the term of her employment, Naffe was the RPOF's only African-American Field Director.

3.      Shortly after Naffe started working for the RPOF, she was surprised and disappointed to learn that her job as a Field Director for Southwest Florida was dominated by



state-wide assignments concerning African-American persons, organizations and issues. The RPOF's white Field Directors received few if any such assignments. This deliberate and involuntary race matching of job assignments was discriminatory and personally degrading.

4.     Naffe also was subjected to racially insensitive and stereotypical remarks by her supervisors, which created a hostile work environment.

5.     On numerous occasions, Naffe complained to officials of the RPOF and the other defendants about the race-matched job assignments and the hostile work environment. However, rather than producing any remedial action, Naffe's complaints resulted in a campaign of retaliatory discipline against her by her immediate supervisor and others.

6.     Finally, when she had no other recourse, Naffe filed a discrimination complaint with the U.S. Equal Employment Opportunity Commission ("EEOC"). Approximately three weeks later, she was summarily discharged.

### Jurisdiction And Venue

7.     This Court has jurisdiction over this suit pursuant to the provisions of 28 U.S.C. §1331 and 28 U.S.C. §1343.

8.     Venue is proper in the Middle District of Florida because each of the defendants conducts business in this district and the acts complained of occurred in this district.

### Parties

9.     Naffe is a resident of Tampa, Florida.

10.    The RPOF is a state-wide political organization. The RPOF is identified by Federal Election Commission ("FEC") ID No. C00099259.

11.     The Republican National Committee ("RNC") is a national political organization. The RNC is identified by FEC ID No. C00003418.

12.     Bush-Cheney '04, Inc. ("Bush-Cheney") is a national political organization. Bush-Cheney is identified by FEC ID No. C00386987.

13.     Naffe was hired by the RPOF and reported initially only to RPOF officials. However, beginning in early 2004, the RNC and Bush-Cheney became actively involved along with the RPOF in the day-to-day supervision of Naffe's work.  For example:

(a)     Officials of the RNC and the Bush-Cheney campaign gave specific directives to Naffe about her job assignments. Mandy Fletcher ("Fletcher"), Political Director for Bush-Cheney, and Brett Doster ("Doster"), Executive Director of Bush-Cheney Florida, issued numerous instructions to Naffe concerning specific assignments during Vice-President Richard Cheney's visit to Tampa on February 20, 2004. Andy Palmer ("Palmer"), the RNC's 72-Hour Director for Florida, issued instructions to Naffe concerning the planning and execution of various other programs.

(b)     The RPOF, the RNC and Bush-Cheney have interconnected financial operations and common objectives.

(c)     The RNC and/or Bush-Cheney furnished funds used to pay part of Naffe's salary.

(d)     Officials of the RNC and/or Bush-Cheney participated in disciplinary actions against Naffe.

14.     After early 2004, the RNC and Bush-Cheney acted together with the RPOF as joint employers of Naffe. As such, they are jointly and severally liable for the discrimination and retaliation experienced by Naffe.

### General Factual Allegations

15.     Naffe was hired by the RPOF on or about August 22, 2003 as a Field Director for Southwest Florida.

16.     During the term of Naffe's employment by the RPOF, she was the only African-American Field Director in Florida.

17.     During the pre-employment interview process, Naffe was not advised by the RPOF's officials that her job assignments as a Field Director for Southwest Florida would be concentrated on state-wide African-American persons, organizations and issues.

18.     On or about September 23, 2003, Naffe was told by Allison Defoor ("Defoor"), Vice-Chairman of the RPOF, that she was to act as a liaison to the African-American Republican Clubs throughout Florida and provide them "with whatever they need." Thereafter, Naffe was treated by the RPOF against her will as its state-wide African-American "point person" and her work was concentrated on African-American persons, organizations and issues. For example:

(a)     Naffe was designated by the RPOF to be the contact person to receive telephone calls from African-American Republicans throughout Florida who needed help on a variety of matters. Some of these requests were made by members of the African-American Republican Clubs; others were made by African-American party members concerning a variety of local "pet" projects.

4

(b) Naffe was directed to participate in the "African-American Roundtable" sessions that were held during each of the RPOF's quarterly meetings.

(c) Naffe was assigned responsibility for drafting a constitution for the newly-formed Florida Federation of Black Republicans.

(d) Naffe was assigned responsibility for assisting members of the Palm Beach County Republican Party in coordinating contacts with members of the Black Republican Clubs.

(e) Naffe was assigned the task of putting together a list of all African-Americans who had been appointed to public office by Governor Jeb Bush.

(f) Naffe was assigned the task of contacting prominent African-American Republicans and soliciting financial contributions to the RPOF, the RNC and Bush-Cheney.

19. The RPOF's white Field Directors received few if any such assignments.

20. The RPOF maintained and, on information and belief, continues to maintain a policy or practice of matching the race of its Field Directors with the race of those persons with whom the Field Directors were or are expected to interact.

21. In December 2003, Naffe complained to her immediate supervisor, Terry Kester ("Kester"), the RPOF's Executive Director of Party Development, about the race-matched job assignments. Not only was Kester unresponsive to Naffe's complaints, but also he accused Naffe of being "insubordinate" and "not a team player" for raising the issue.

22. Thereafter Kester became increasingly hostile and abusive in his day-to-day interactions with Naffe. For example:

(a)     Kester insulted and personally demeaned Naffe, including calling her "ignorant."

(b)     Kester issued contradictory and confusing instructions to Naffe.

(c)     Kester severely criticized Naffe's work for purported minor performance deficiencies.

23.     Kester disciplined the RPOF's white Field Directors less frequently and/or less severely for the same or similar purported performance deficiencies.

24.     By his hostile and abusive actions toward Naffe, Kester intended to force Naffe either to submit to the defendants' discriminatory job assignment policies or to resign.

25.     Kester also made racially insensitive and stereotypical remarks to Naffe and in her presence. For example:

(a)     In conversations with Naffe, Kester routinely referred to African-Americans as "you people" or "your people."

(b)     Kester told Naffe that she was being given race-matched job assignments because "you understand your people."

(c)     Kester showed Naffe a portrait of the late Senator Strom Thurmond and boasted, in a context intended to convey racial hostility, that he believed Thurmond was "the best Senator who ever lived."

(d)     Just prior to an NAACP march in Tallahassee in February 2004, Kester instructed Naffe to contact all of the African-American Republican Clubs in Florida and discourage their members from attending the march. Kester told Naffe that the RPOF was afraid the club members would not be able to respond in an intelligent way to the NAACP's

6

policy concerns. Kester stated, "The last thing we want to see is some black guy on television wearing a Republican shirt and responding to the press in an ignorant way."

26.     Faced with the ongoing race-matched job assignments and Kester's mounting hostility, Naffe decided to complain to other RPOF officials. In January 2004, Naffe told Christina Sheppard ("Sheppard"), the RPOF's Deputy Director of Party Development, that she was being "pigeon-holed" with job assignments for African-Americans simply because she is African-American. Sheppard replied, "Well, you are pigeon-holed, so just deal with it."

27.     Naffe next complained to Carole Jean Jordan ("Jordan"), the Chairperson of the RPOF, about Kester's racially insensitive and stereotypical remarks. Jordan replied, "Terry can't help the way he is. He comes from a redneck part of the state."

28.     On another occasion, Naffe complained to Jordan about the race-matched job assignments she was receiving from Kester. Jordan replied, "I'm not going to tell Terry how to do his job. Just talk to him about it."

29.     On or about February 28, 2004, Naffe complained about Kester to Geoffrey Becker ("Becker"), the RPOF's Director of Political Affairs. Specifically, Naffe complained about Kester's racially insensitive remarks and abusive treatment towards her. Becker told Naffe to "hang in there" and said that he would speak to Kester.

30.     On March 1, 2004, Kester, along with Sheppard and the RNC's official, Palmer, made a conference telephone call to Naffe. At the outset, Kester said that he had spoken to Becker. Kester was especially stern and overbearing during the call, and rebuked Naffe based on false accusations.

31.     Later that day, Naffe spoke by telephone with an EEOC representative in the Tampa field office and retained an attorney, Keith DuBose ("DuBose").  Naffe then sent Becker an electronic mail message stating, among other things, that she had contacted the EEOC.

32.     On or about March 3, 2004, Naffe was ordered by the RPOF to attend a meeting in Tallahassee on March 5 to discuss "her continued employment."

33.     On March 4, 2004, DuBose telephoned Robert Sechen ("Sechen"), the RPOF's General Counsel.  DuBose explained to Sechen that he represented Naffe.  DuBose and Sechen agreed to talk again later that day about postponing the upcoming March 5 meeting in Tallahassee.

34.     Shortly after the call between DuBose and Sechen ended, Sechen telephoned Naffe, notwithstanding the fact that he knew DuBose represented her.  Naffe concluded from Sechen's tone of voice that he was very angry.  Sechen demanded to know why Naffe had contacted the EEOC.  When Naffe tried to tell Sechen that she had retained an attorney and that Sechen's questions should be directed to him, Sechen cut her off.  Sechen yelled, "You're my employee, and I have a right to talk to you.  You don't have the right to an attorney.  You don't have the right to speak to the EEOC.  If you do that, you will lose your job."

35.     By his statements to Naffe, Sechen intended to obstruct and impede an ongoing EEOC investigation of the defendants' discriminatory employment practices.

36.     Sechen's statements to Naffe violated ethics rules of The Florida Bar governing attorney conduct, including Rule 4-4.1, Rule 4-4.2 and Rule 4-4.4.

8

37.     Later that day, DuBose again spoke to Sechen by telephone. They agreed that the meeting in Tallahassee would be re-scheduled to March 10.

38.     On or about March 9, 2004, the RPOF initiated a self-described "independent investigation" into Naffe's allegations of discrimination. In fact, as of that date the process of discharging Naffe already had begun and the investigation was a pretext used by the RPOF to develop negative information about Naffe.

39.     On March 10, 2004, the re-scheduled meeting took place in Tallahassee. Naffe appeared in person and her attorney, DuBose, appeared by telephone. Sechen led the meeting. Sechen told DuBose that he wanted to have Naffe's statement recorded under oath. However, he conceded that this procedure would not be used for any other witnesses. DuBose replied that while Naffe was willing to assist the RPOF in its "independent investigation," the same rules should be applied to all participants. The meeting ended without an agreement about the proper procedures to follow. The meeting was transcribed by a court reporter; however, the RPOF has refused to provide Naffe or her counsel with a copy of the transcript.

40.     In mid-March, the RPOF unreasonably refused to reimburse Naffe for out-of-pocket expenses that she had incurred in connection with her duties as a Field Director. The reasons offered by the RPOF for its refusal to reimburse Naffe were and are pretextual.

41.     On or about March 15, 2004, Naffe filed a formal Charge of Discrimination with the EEOC.

42.     On or about March 29, 2004, Sheppard made a request to the Escambia County Circuit Court Clerk's Office and obtained a copy of a restraining order Naffe had

sought in 1998 against a former college professor with whom she was acquainted. The restraining order was unrelated either to Naffe's employment or to race discrimination. The RPOF released copies of the restraining order to the press in an effort to mislead the public and to embarrass and publicly humiliate Naffe.

43.     On April 2, 2004, Naffe was summarily discharged, purportedly for job performance deficiencies.

44.     The reasons offered for Naffe's discharge were and are pretextual.

## Procedural Allegations

45.     On or about March 15, 2004, Naffe filed EEOC Charge of Discrimination No. 151-2004-00786 pertaining to the matters alleged herein. On June 10, 2004, the EEOC issued Naffe a 90-day Notice of Right to Sue.

## First Cause of Action –
## Intentional Race Discrimination
## In Job Assignments

46.     Naffe repeats and realleges all of the allegations set forth in paragraphs 1-45.

47.     The defendants' actions in matching Naffe's job assignments involuntarily, based on her race, with the race of those persons with whom she was expected to interact as a Field Director constituted intentional race discrimination in violation of the provisions of 42 U.S.C. §1981 and 42 U.S.C. §2000e-2.

48.     As a direct and proximate result of these violations, Naffe suffered and continues to suffer humiliation, embarrassment and other forms of mental and emotional distress.

10

## Second Cause of Action –
## Intentional Race Discrimination
## In Disciplinary Matters

49.     Naffe repeats and realleges all of the allegations set forth in paragraphs 1-48.

50.     The defendants' actions in disciplining Naffe more frequently and/or more severely than it disciplined its white Field Directors for the same or similar purported performance deficiencies constituted intentional race discrimination in violation of 42 U.S.C. §1981 and 42 U.S.C. §2000e-2.

51.     As a direct and proximate result of these violations, Naffe suffered and continues to suffer humiliation, embarrassment, loss of reputation and other forms of mental and emotional distress.

## Third Cause of Action –
## Hostile Work Environment

52.     Naffe repeats and realleges all of the allegations set forth in paragraphs 1-51.

53.     The racially insensitive and stereotypical remarks made by Kester to Naffe were sufficiently severe or pervasive to alter the conditions of Naffe's employment and create a hostile work environment.

54.     The defendants had actual or constructive knowledge of the racially hostile work environment and failed to take prompt and effective remedial action.

55.     The defendants' maintenance of a hostile work environment violated the provisions of 42 U.S.C. §1981 and 42 U.S.C. §2000e-2.

56.     As a direct and proximate result of these violations, Naffe suffered and continues to suffer humiliation, embarrassment and other forms of mental and emotional distress.

11

### Fourth Cause of Action –
### Retaliation

57.     Naffe repeats and realleges all of the allegations set forth in paragraphs 1-56.

58.     The defendants retaliated against Naffe on account of her opposition to the involuntary race-matched job assignments and the racially hostile work environment.

59.     The defendants also retaliated against Naffe on account of her participation in an EEOC filing and investigation of the defendants' discriminatory employment practices.

60.     The defendants' retaliatory actions against Naffe violated the provisions of 42 U.S.C. §1981 and 42 U.S.C. §2000e-3.

61.     As a direct and proximate result of these violations, Naffe suffered a loss of salary and other benefits of employment, and continues to suffer humiliation, embarrassment, loss of reputation and other forms of mental and emotional distress.

### Prayer For Relief

62.     WHEREFORE, premises considered, Naffe requests that this Court grant the following relief:

(a)     enter a permanent injunction directing the defendants' officers, agents and employees to (i) cease using the race of their employees as a basis for making involuntary job assignments, (ii) not retaliate (e.g. negative job references) against Naffe for opposing discrimination in the workplace, filing an EEOC charge of discrimination, seeking the advice of counsel, or otherwise engaging in conduct protected by 42 U.S.C. §2000e-3(a), (iii) expunge from Naffe's personnel file all references to her discharge and/or disciplinary actions taken against her, and (iv) establish an effective internal complaint procedure for job discrimination and retaliation issues;

(b)     award Naffe back pay;

(c)     reinstate Naffe or award her front pay;

(d)     award Naffe compensatory damages in an amount adequate to compensate her for the humiliation, embarrassment, loss of reputation and other forms of mental and emotional distress she has suffered and continues to suffer;

(e)     award Naffe punitive damages in an amount adequate to punish the defendants for their (i) oppressive conduct toward her, and (ii) their reckless indifference to her federally protected rights, and (iii) that would effectively deter the defendants from engaging in similar conduct in the future;

(f)     award Naffe her reasonable attorneys' fees and litigation costs; and

(g)     award Naffe such other relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Naffe demands a trial by jury of all issues so triable.

13

Dated: August 23, 2004

Charles G. Burr
(Trial Counsel)
Fla. Bar No. 689416

Sam J. Smith
(Trial Counsel)
Fla. Bar No. 818593
Marguerite M. Longoria
Fla. Bar No. 989915
BURR & SMITH, LLP
442 W. Kennedy Blvd.
Suite 300
Tampa, Florida 33606-1495
813/253-2010
813/254-8391 (facsimile)

Cyrus Mehri / by CB
Cyrus Mehri
(Trial Counsel)
Nicole Austin-Hillery
MEHRI & SKALET, PLLC
1300 19th St. N.W.
Suite 400
Washington, DC 20036
202/822-5100
202/822-4997 (facsimile)